UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**JOSHUA NAVARRO, BENJAMIN**
**KOMITA, JADEN KREKOW,**
**KYLE STEWART, MASON**
**YASKOVIC and THOMAS**
**FRANCIS,**

**Plaintiffs,**

**v.**                                                    **Case No.  6:22-cv-1950-CEM-EJK**

**FLORIDA INSTITUTE OF**
**TECHNOLOGY, INC.,**

**Defendant.**

_____/

## ORDER

THIS CAUSE is before the Court on Plaintiffs' Motion for Preliminary Injunction ("Motion," Doc. 28), Defendant's Response in Opposition ("Response," Doc. 37), and Plaintiffs' Reply ("Reply," Doc. 48). The Court held an evidentiary hearing ("Hearing") on the Motion. (*See generally* Min. Entry, Doc. 57). For the reasons stated herein, the Motion will be granted.

### I.    BACKGROUND

Defendant Florida Institute of Technology, Inc. ("FIT") is a private research university in Melbourne, Florida that receives federal financial assistance. (Compl., Doc. 2, at 6; Answer, Doc. 24, at 5). In June 2022, FIT announced that it would

discontinue five varsity sports programs, including men's rowing, and transition each to club-level. (Doc. 2 at 13; Doc. 24 at 8–9). In October 2022, Plaintiffs filed this lawsuit, alleging three violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX"). (Doc. 2 at 18–19). Plaintiffs are six students at FIT and former members of its defunct men's rowing team, who bring this action pursuant to Federal Rule of Civil Procedure 23(b)(2) on behalf of themselves and on behalf of "a class or classes consisting of all present and future FIT male undergraduate students—including currently enrolled students and prospective students—who have sought, who seek, or who will seek to obtain the benefits of intercollegiate athletics sponsored by FIT by participating in such." (*Id.* at 27). The Court has not yet determined whether to certify this action as a class action, *see* Fed. R. Civ. P. 23(c)(1)(A), thus at this stage Plaintiffs proceed only as individual litigants. Plaintiffs move for a preliminary injunction "immediately reinstating the men's rowing team at FIT until this case can be heard on the merits." (Doc. 28 at 25).

## II.    LEGAL STANDARD

"The grant or denial of a preliminary injunction is a decision within the sound discretion of the district court." *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983). To obtain a preliminary injunction, the movant must sufficiently establish that (1) "it has a substantial likelihood of success on the merits;" (2) "irreparable

injury will be suffered unless the injunction issues;" (3) "the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party;" and (4) "the injunction would not be adverse to the public interest." *Forsyth Cnty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1039 (11th Cir. 2011) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc)). "A preliminary injunction, moreover, 'is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites.'" *Llovera v. Fla.*, 576 F. App'x 894, 896 (11th Cir. 2014) (per curiam) (quoting *Forsyth Cnty.*, 633 F.3d at 1039). "To carry its burden, a plaintiff seeking a preliminary injunction must offer proof beyond unverified allegations in the pleadings. Moreover, vague or conclusory affidavits are insufficient to satisfy the plaintiff's burden." *Palmer v. Braun*, 155 F. Supp. 2d 1327, 1331 (M.D. Fla. 2001), *aff'd*, 287 F.3d 1325, 1327 (11th Cir. 2002).

Failure to satisfy even one element for a preliminary injunction is fatal to issuance of the injunction. *Llovera,* 576 F. App'x at 896*.* If the Court finds that Plaintiffs have failed to carry their burden as to a single element, the Court need not consider the remaining elements. *Henry v. Nat'l Hous. P'ship*, No. 1:06-cv-008-SPM, 2006 WL 8443138, at *1 (N.D. Fla. Sept. 19, 2006) ("Where a plaintiff has not carried his burden as to any one of the elements required for a preliminary

injunction, it is unnecessary to address the remaining elements." (citing *Jefferson Cnty.*, 720 F.2d at 1519)).

### III.    ANALYSIS

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Title IX reaches institutions and programs that receive federal funds . . . which may include nonpublic institutions." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009). "The express statutory means of enforcement is administrative," however, "Title IX is also enforceable through an implied private right of action." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 280–81 (1998) (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979)).

Title IX "sketches wide policy lines, leaving the details to regulating agencies." *Cohen v. Brown Univ.*, 991 F.2d 888, 893 (1st Cir. 1993). Congress explicitly delegated to the Secretary of Health, Education and Welfare ("HEW") the task of promulgating regulations implementing Title IX, including prescribing standards for "intercollegiate athletic activities." Pub. L. No. 93–380, § 844, 88 Stat. 612 (1974). HEW,[1] through its Office of Civil Rights ("OCR"), issued an official

---

[1] In 1979, Congress divided HEW into the Department of Health and Human Services and the Department of Education. *See* Department of Education Organization Act, 20 U.S.C. §§ 3401–

Policy Interpretation to guide the enforcement of Title IX in intercollegiate athletics. 44 Fed. Reg. 71,413–23. "It is well established that an agency's construction of its own regulations is entitled to substantial deference." *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 149 (1991) (quotation omitted). This Court must accord appreciable deference to the agency's interpretation of Title IX given its express authority pursuant to statutory delegation. *See Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844–85 (1984) ("If Congress has explicitly left a gap for the agency to fill . . . [s]uch legislative regulations are given controlling weight.").

The Policy Interpretation delineates three major areas of regulatory compliance. 44 Fed. Reg. 71,415–17. Divergence from Title IX's mandate in any one of these three areas constitutes a separate and distinct claim. *See e.g.*, *Beasley v. Ala. State Univ.*, 966 F. Supp. 1117, 1122 (M.D. Ala. 1997); *Favia v. Indiana Univ. of Pa.*, 812 F. Supp. 578, 584–85 (W.D. Pa. 1993). Plaintiffs allege violations of all three areas of Title IX regulatory compliance of intercollegiate athletics, (*see* Doc. 2 at 18–19), but whether FIT has "fail[ed] to provide to Plaintiffs equal athletic participation opportunities, or to accommodate their interests and abilities" forms the basis of Plaintiffs' request for a preliminary injunction,  (Doc. 28 at 7–8). To test

---

3510, Pub. L. 96–88 (1979). The Department of Education received HEW's functions with respect to educational programs. 20 U.S.C. § 3441(a)(3).

equal opportunity to participate in athletic programs, OCR considers "whether the selection of sports and levels of competition effectively accommodate[s] the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c)(1). OCR assesses equality with respect to participation opportunities in any one of the following ways:

> (1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or
>
> (2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or
>
> (3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

44 Fed. Reg. 71,418.

OCR issued a "Dear Colleague" letter to provide further guidance on what has come to be known as the "three-part test." U.S. Dep't of Educ., *Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test* (Jan. 16, 1996),

https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html ("1996 Letter").[2] The 1996 Letter confirmed that the three-part test provides institutions with "three individual avenues to choose from" to remain compliant with Title IX. *Id.* Plaintiffs assert that FIT fails to satisfy each part of the test, (Doc. 28 at 13, 19), and FIT disputes this assertion only as to the first pathway, (Doc. 37 at 13), which "furnishes a safe harbor for those institutions that have distributed athletic opportunities in numbers 'substantially proportionate' to the gender composition of their student bodies." *Cohen*, 991 F.2d 897–98.

The 1996 Letter explained that "substantial proportionality" is the standard because it is often "unreasonable to expect an institution to achieve exact proportionality," because, for example, of "natural fluctuations in enrollment and participation rates or because it would be unreasonable to expect an institution to add athletic opportunities in light of the small number of students that would have to be accommodated to achieve exact proportionality." 1996 Letter. Thus, there is no "magic number at which substantial proportionality is achieved." *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 110 (4th Cir. 2011). Instead, "substantial proportionality is determined on a case-by-case basis in light of 'the institution's specific circumstances and the size of its athletic program.'" *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 94 (2d Cir. 2012) (quoting 1996 Letter).

---

[2] A copy of the 1996 Letter was filed by Defendant at Docket Entry 37-5.

To determine substantial proportionality, OCR asks us to begin "with a determination of the number of participation opportunities afforded to male and female athletes in the intercollegiate athletic program." 1996 Letter; *see, e.g.*, *Balow v. Mich. State Univ.*, 24 F.4th 1051, 1056 (6th Cir. Feb. 1, 2022). "In making this determination, we count only actual athletes, not unfilled slots, because Title IX participation opportunities are real, not illusory." *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 856 (9th Cir. 2014) (quotation omitted).

After determining the number of participants, the next step is to calculate the participation gap, which is the "difference between the participation rate in an institution's intercollegiate athletic program and its full-time undergraduate student enrollment." 1996 Letter. The gap is substantially proportionate "when the number of opportunities that would be required to achieve proportionality would not be sufficient to sustain a viable team, i.e., a team for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team." *Id.*

## A.    Substantial Likelihood of Success on the Merits

The first prerequisite for obtaining a preliminary injunction—substantial likelihood of success on the merits—"is generally the most important." *Schiavo ex rel. Schindler v. Schiavo*, 357 F. Supp. 2d 1378, 1383 (M.D. Fla. 2005), *aff'd*, 403 F.3d 1223, 1229 (11th Cir. 2005). "A substantial likelihood of success on the merits

requires a showing of only likely or probable, rather than certain, success." *Id.* (emphasis omitted). Nevertheless, "the movant may also have his motion granted upon a lesser showing of a substantial case on the merits when the balance of the equities . . . weighs heavily in favor of granting the stay." *Garcia–Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986). Here, Plaintiffs must demonstrate a substantial likelihood of success on their claim that they were discriminated by FIT's failure to provide equal athletic participation opportunities.

Plaintiffs allege that "in reviewing the data, FIT has fallen short, or had a significant participation gap of male athletes, for 16 of the last 18 years." (Doc. 28 at 16). Plaintiffs offer evidence that FIT's enrollment for the 2018–2019 school year was a total of 3,261 undergraduate students, comprised of 2,325 (71.3%) men and 936 (28.7%) women. (Lopiano Report, Doc. 28-2, at 12). Plaintiffs highlight 2018–2019 instead of more recent years because, as their expert testified during the hearing, the pandemic years are considered outliers due to the mandatory shut down of schools. For 2018–2019, Plaintiffs offer evidence that FIT had a total of 533 athletes, 342 of which were men, and therefore, men represented only 64.2% of athletes compared to their 71.3% undergraduate enrollment. (*Id.*). This represents a shortfall of 132 athletic opportunities for men. (*Id.* at 15). Plaintiffs produced evidence at the Hearing that FIT had a similar shortfall of 117 opportunities for men in 2021–2022 and a shortfall of 121 opportunities for men in 2022–2023. (Pl.'s Hr'g

Ex. 1A; *see also* Doc. 28-2 at 21–25, 29–30). Plaintiffs argue that because FIT was already in violation of Title IX, it could not legally cut a viable men's team. (Doc. 28 at 19).

In response, FIT proposes a different calculation. FIT argues that Plaintiffs cannot succeed on the merits because "[w]hen full-time undergraduates attending [FIT's online-only division] are included, along with esport student-athletes that meet the definition of a Title IX participant, [FIT's] application of the framework in the 2021–2022 academic year led to a Participation Gap of three male students, or .16%." (Doc. 37 at 16). This would be a substantially proportionate participation gap because a varsity team cannot be supported by just three students. However, FIT's math assumes two conditions: (1) its esports program offers genuine participation opportunities for intercollegiate athletics and (2) full-time students enrolled in FIT's online-only division ("Florida Tech Online") are properly counted in its total enrollment for Title IX purposes. Plaintiffs underline the lack of precedent on these two novel arguments. (*See* Doc. 28 at 15 n.11 ("Plaintiffs are unaware of any Title IX case ever recognizing a fully online student—from wherever they may be attending—as part of the full-time enrollment numbers for the substantial participation prong."); *id.* at 19 n.15 ("No court has ever opined that E-Sports meets the definition of a sport for Title IX.")). The Court will address these two conditions in turn.

### 1.    *Esports as Genuine Participation Opportunities*

In 2008, OCR issued another "Dear Colleague" letter, clarifying that it "does not have a specific definition of the term 'sport.'" U.S. Dep't of Educ., *Dear Colleague Letter: Athletic Activities Counted for Title IX Compliance* (Sept. 17, 2008), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-20080917.html ("2008 Letter").[3] OCR presumes that an institution's established sports can be counted for Title IX compliance purposes if the institution is a member of an intercollegiate athletic organization, the most dominant being the National Collegiate Athletic Association ("NCAA"), and if the organization's nondiscretionary requirements satisfy the factors announced by OCR. *Id.* When that presumption is inapplicable, the institution's activity is evaluated on a case-by-case basis according to the same factors, which are "related to an activity's structure, administration, team preparation and competition." *Id.* Importantly, OCR made clear that its policy is to encourage compliance "in a flexible manner that expands, rather than limits, student athletic opportunities." *Id.* Therefore, OCR suggests an approach that grants institutions "the flexibility to create athletics programs that are responsive to the specific interests and abilities of their particular student bodies." *Id.*

Esports describes the genre of competitive, organized video gaming. FIT argues that its co-ed esports program, which is supported through its athletic

---

[3] A copy of the 2008 Letter was filed by Defendant at Docket Entry 37-6.

department, provides qualifying athletic opportunities because "esport student-athletes are treated similarly to other student-athletes on campus." (Doc. 37 at 7). Esport participants at FIT: "have access to the same support services, including athletic trainers, as traditional student athletes"; are selected through tryouts; will be eligible to receive scholarships beginning in Fall 2023; and prepare and compete "on a set schedule, as determined by the National Association of Collegiate Esports and National Esports Collegiate Conference." (Joss Aff., Doc. 37-1, at 6). Plaintiffs do not necessarily dispute FIT's representations of its esports program but argue that legally it is still not a sport within the purview of Title IX, focusing on the fact that esports do not require athletic ability and are not governed in a manner necessary to qualify as such. (*See* Doc. 28-2 at 27).

In *Biediger*, the Second Circuit evaluated the district court's decision to hold that competitive cheerleading does not yet qualify as a "sport." 691 F.3d at 102–05. No favorable presumption applied to competitive cheerleading because it was not sanctioned by the NCAA. *Id.* The Second Circuit summarized the OCR factors analyzed by the lower court and admitted that "although there are facts on both sides of the argument, in the end, the balance tips decidedly against finding competitive cheerleading presently to be a 'sport.'" *Id.* The court recognized that Quinnipiac's athletic department structured and administered the competitive cheerleading program consistent with its other varsity sports, and found that the practice time,

regimen, and venue were consistent as well. *Id.* Additionally, the length of the season and even the "purpose of the team . . . [were] akin to that of other varsity sports." *Id.* However, certain shortcomings fatally distinguished competitive cheerleading from traditional varsity sports, including a lack of off-campus recruitment, a uniform set of rules, intercollegiate competition, or a progressive playoff system. *Id.*

Competitive cheerleading offered an example of a "close-call" application of OCR's factors. The same cannot be said about esports. After all, competitive cheerleading is "physically challenging, requiring competitors to possess 'strength, agility, and grace.'" *Id.* In contrast, esports does not require athletic ability. Additionally, "[t]here are over 13 different video games recognized in E-Sports competition, with none of the rules for these games promulgated by an E-Sport national governing organization (i.e., NCAA football rules). The games are owned and created by a commercial vendor and leased to the players. Sport governance associations have no control over the rules of the game itself." (Doc. 28-2 at 27). There is also no evidence that FIT's esports program recruits off-campus or competes in a progressive playoff system. Even accepting that FIT's esport participants "practice and compete," there is no evidence that they do so "in a manner consistent with the school's other varsity teams." *Biediger*, 691 F.3d at 103. Without more, the Court cannot hold that FIT's esports program provides genuine participation opportunities under Title IX.

2.     *Florida Tech Online Students*

By FIT's own calculations, when its esports program is not considered for Title IX purposes, FIT is not in compliance with Title IX's requirements. (Pl.'s Hr'g Ex. 1A (showing that even when online students are considered under the numbers provided by FIT's Athletic Director, FIT still has a participation gap of 62 for year 2021–2022)). Therefore, at this stage, the Court need not determine whether FIT's online-only students should be considered.[4] Plaintiffs have established a substantial likelihood of success on their Title IX claim.

## B.     Necessary to Prevent Irreparable Harm

Plaintiffs must establish that they will suffer irreparable injury absent issuance of an injunction. *Forsyth Cnty.*, 633 F.3d at 1039. "A showing of irreparable injury is the *sine qua non* of injunctive relief." *Hoop Culture, Inc. v. Gap Inc.*, 648 F. App'x 981, 984 (11th Cir. 2016) (citing *Siegel*, 234 F.3d at 1176). "An injury is

---

[4] However, the Court will note that the definition of "full-time students" FIT uses to support its argument that online-only students should be considered is contained in the Federal Student Aid Handbook, (Doc. 37-2 at 2), which obviously deals with student financial aid and not Title IX. Moreover, that definition derives from regulations involving Title IV of the Higher Education Act of 1965, 20 U.S.C. § 1070 *et. seq*. 2022–2023 Federal Student Aid Handbook, Vol. 2, 28 https://fsapartners.ed.gov/knowledge-center/fsa-handbook/pdf/2022-2023 (citing 34 C.F. R. § 668.2); 34 C.F.R. § 668.2(b) (providing definitions that "apply to all Title IV, [Higher Education Act] programs," including "[f]ull-time student"). Title IV deals with the operation of federal "programs that disburse funds to students to help defray the costs of higher education," including "the Federal Pell Grant, the Federal Family Educational Loan Program, the William D. Ford Federal Direct Loan Program, and the Federal Perkins Loan," *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1043 (11th Cir. 2015), and it is likely that the policy considerations behind the definition of "full-time student" for student financial aid would differ from the policy considerations behind the discrimination concerns encompassed by Title IX.

'irreparable' only if it cannot be undone through monetary remedies." *Ne. Fla. Chapter of Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). An injury must be actual and imminent not remote or speculative. *Id.* "Mere injuries, however substantial, in terms of money . . . are not enough." *Id.* (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974); *accord United States v. Jefferson Cnty.*, 720 F.2d 1511, 1520 (11th Cir. 1983)).

"Courts have consistently held that, given the fleeting nature of college athletics, plaintiffs will suffer irreparable harm by losing the opportunity to participate in their sport of choice on a continuous and uninterrupted basis." *Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277, 291 (D. Conn. 2009); *see also Brooks v. State Coll. Area Sch. Dist.*, No. 4:22-cv-01335, 2022 U.S. Dist. LEXIS 217173, at *19–20 & n.79 (M.D. Pa. Dec. 1, 2022) (collecting cases that are "demonstrative of courts' longstanding finding that lost opportunity in the context of student athletics can be considered irreparable harm"); *Mayerova v. E. Mich. Univ.*, 346 F. Supp. 3d 983, 997 (E.D. Mich. 2018) (stating that "[i]n general, courts have found that the elimination of a women's team creates irreparable harm when the plaintiffs have demonstrated a strong likelihood of success on the merits of their Title IX claim" and collecting cases); *c.f. id.* at 997–98 (addressing a minority of cases where the courts "found irreparable harm to be lacking" and distinguishing those cases, noting

that they also "found that the plaintiffs were unlikely to succeed on the merits of their Title IX claim").

Plaintiffs argue that they "will suffer irreparable harm by losing any opportunity to participate in their chosen intercollegiate sport and continuing that sport on greater competitive stages." (Doc. 28 at 3). Plaintiffs Benjamin Komita and Mason Yaskovic testified to the harm they suffered when FIT abruptly revoked their varsity status mid-summer, including the loss of coaches, incoming recruits, and the ability to row in the fall 2022 season. (*See also* Komita Decl., Doc. 28-1, at 1–7; Yaskovic Decl., *id.* at 29 ("Though all of this has dealt critical damage to the team the greatest impact has been on the mental state of the athletes.")). Plaintiffs stress the timeliness of a preliminary injunction to allow them to race in the spring season. (Doc. 28 at 22).

FIT argues that Plaintiffs' delay in seeking relief undercuts their claim of irreparable harm. (Doc. 37 at 9). *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm."). Plaintiffs waited about six months from FIT's announcement to the filing of this Motion. FIT argues the delay shows that any harm is not imminent, and therefore, there is no "need for speedy or urgent action to protect [Plaintiffs'] rights before a case can be fully resolved on the merits." (Doc. 37 at 9–10). However,

the record shows that Plaintiffs, through counsel, first notified FIT of their representation and intention to sue in September 2022. (*See generally* Sept. 6, 2022 Letter, Doc. 48-2). Plaintiffs asked for "immediate receipt" of information on which FIT relies on to assert any contention of Title IX compliance, including "NCAA squad lists." (*Id.* at 4). According to Plaintiffs, they did not receive squad lists until the end of November. (Doc. 48 at 3). FIT cannot contribute to a delay and then employ it to its advantage.

Additionally, citing out of circuit caselaw, FIT argues that Plaintiffs face no irreparable harm because they did not lose their scholarships and all are free to transfer to other colleges. (Doc. 37 at 10–11 (citing *Equity in Athletics, Inc.*, 291 F. App'x at 521; *Miller v. Univ. of Cincinnati*, No. 1:05-cv-764, 2007 WL 2783674, at *11 (S.D. Ohio Sept. 21, 2007)). These cases are not analogous.

In *Equity in Athletics, Inc.*, the defendant college was cutting athletic programs in order to bring itself *into* compliance with Title IX, as opposed to the cut resulting in a lack of compliance. 291 F. App'x at 520. Further, under Fourth Circuit precedent, the standard for granting a preliminary injunction is slightly different than that in the Eleventh Circuit—the Fourth Circuit "places the most emphasis on . . . the balancing of the harms" to each party. *Id.* at 521. Therefore, "[i]f the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify the issuance of the injunction." *Id.* (quotation omitted). The *Equity*

*in Athletics, Inc.* Court found that the district court did not abuse its discretion in determining that there was not a likelihood of success on the merits and the harm to the defendant college—financial cost as well as forcing the college to not be in control of its compliance with Title IX—outweighed the harm to the plaintiffs given that the plaintiffs were still permitted to keep their scholarships or transfer schools. *Id.* at 521–22, 524. The facts and law of *Equity in Athletics, Inc.* are substantially different than the circumstances at issue here, and therefore, that case holds little persuasive value.

In *Miller*, the court also determined that the plaintiffs had failed to establish a likelihood of success on the merits, noting "terminating the women's rowing program will not place the University in violation of the equal accommodation prong of Title IX."[5] 2007 WL 2783674 at *9. Moreover, in the discussion regarding irreparable injury, the *Miller* Court noted that there was "no testimony directly on the point" of any difficulties that the plaintiffs would have in transferring to another comparable school with a rowing team. 2007 WL 2783674 at *11. The same cannot be said here, both Komita and Yaskovic testified as to the difficulties they would face with transferring to a different school, including the fact that they only had one

---

[5] The plaintiffs also brought an Equal Protection claim and a Title IX retaliation claims, on which the *Miller* Court also found that they had not shown a likelihood of success on the merits. 2007 WL 2783674 at *9, *11.

year left to row[6] combined with the announcement occurring shortly before the beginning of the school year. (*See also* Doc. 28-1 at 3 (explaining that "the decision to cut the [men's rowing team] was announced too late leaving me with no viable options" to transfer); Stewart Aff., *id.*, at 20 ("Since the announcement was so late, I had no time to weigh my other options academically or athletically.")).

Unlike the cases cited by FIT, Plaintiffs here have established a strong likelihood of success on the merits of their claims and they presented substantial evidence of irreparable harm. FIT "give[s] insufficient consideration to the unique circumstances college athletes face, making short shrift of the brief time-span in which they are permitted to compete." *Biediger*, 616 F. Supp. 2d at 292. For these reasons, Plaintiffs have satisfied the irreparable injury prong.

## C.    Balance of Harms

The Court must balance the harms faced by Plaintiffs and FIT. Plaintiffs argue that "[a]t most, [FIT's] harm would be the expenditure of funds, which is the exact counter to the definition of an irreparable injury." (Doc. 28 at 23). FIT argues that "immediately reinstat[ing] the men's rowing team to its varsity level would inflict significant harm" on it. (Doc. 37 at 17). Be that as it may, the harm associated with a Title IX violation is serious and "financial concerns alone cannot justify gender discrimination." *Haffer v. Temple Univ*, 678 F. Supp. 517, 530 (E.D. Pa. 1987).

---

[6] Komita is in his last year of eligibility and Yaskovic is in his senior year.

Therefore, "the Court is unsympathetic to [FIT's] claims that it will be unduly harmed by the expenditure of funds necessary to level the playing field." *Daniels v. Sch. Bd. of Brevard Cnty., Fla.*, 985 F. Supp. 1458, 1462 (M.D. Fla. 1997). In short, the balance of harm favors Plaintiffs.

### D.   Public Interest

Finally, the Court considers the public's interest in this case. The public has a compelling interest in eradicating gender discrimination and promoting compliance with Title IX. *See Daniels*, 985 F. Supp. at 1462 ("[T]he public at large, will benefit from a shift to equal treatment."); *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 978 (D. Minn. 2016) ("[T]he public's interest in eradicating sex discrimination is compelling."); *Favia*, 812 F. Supp. at 585 (W.D. Pa. 1993) ("The public has a strong interest in the prevention of any violation of constitutional rights."). Especially because Plaintiffs established a likelihood of succeeding on the merits of their Title IX claim, the public's interest weighs in favor of a preliminary injunction. *See Ohlensehlen v. Univ. of Iowa*, 509 F. Supp. 3d 1085, 1104–05 (S.D. Iowa 2020).

Accordingly, Plaintiffs have sufficiently satisfied the fourth and final prong for obtaining a preliminary injunction. Having satisfied all four prerequisites, Plaintiffs' request for an injunction will be granted.

### E.   Bond

Federal Rule of Civil Procedure 65(c) states, *inter alia*, that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, "it is well-established that the amount of security required by the rule is a matter within the discretion of the trial court . . . [, and] the court may elect to require no security at all." *BellSouth Telecomms.*, 425 F.3d at 971 (citation and internal quotations omitted). "Furthermore, '[a] bond may not be required, or may be minimal, when the harm to the enjoined party is slight.'" *Lepper v. Franks*, No. 5:18-cv-644-Oc-41PRL, 2019 U.S. Dist. LEXIS 5468, at *7 (M.D. Fla. Jan. 11, 2019); *Tancogne v. Tomjai Enters. Corp.*, 408 F. Supp. 2d 1237, 1252 (S.D. Fla. 2005).

Plaintiffs "seek excusal from the bond requirement since they are young student athletes with limited resources." (Doc. 28 at 25 n.18). Because this lawsuit is a form of public interest litigation, the Court will exercise discretion in this case and elect to require no security at all. *See City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) ("[P]laintiffs were engaged in public-interest litigation, an area in which the courts have recognized an exception to the Rule 65 security requirement."); *Daniels*, 985 F. Supp. at 1462.

## IV.   REMEDY

Plaintiffs have satisfied their burden of clearly establishing that they are entitled to preliminary injunctive relief temporarily reinstating the men's rowing team. The award of individual relief to private litigants who have brought their own suit "is not only sensible but is also fully consistent with—and in some cases even necessary to—the orderly enforcement of" Title IX. *Cannon,* 441 U.S. at 705–06. FIT notes that Title IX "provides institutions with flexibility and choice regarding how they will provide nondiscriminatory participation opportunities" and that FIT could "choose to eliminate or cap [women's] teams as a way of complying with part one of the three-part test." (Doc. 38 at 18) (quoting 1996 Letter). However, FIT's violation of Title IX in these circumstances has resulted in particularized irreparable harm to these specific Plaintiffs, so the Court exercises its broad discretion to "protect against irreparable injury and preserve the status quo until the [Court] renders a meaningful decision on the merits." *Schiavo ex rel. Schindler*, 403 F.3d at 1231.

## V.   CONCLUSION

In accordance with the foregoing, it is **ORDERED AND ADJUDED** as follows:

1. Plaintiffs' Motion for Preliminary Injunction (Doc. 28) is **GRANTED**.

2. FIT shall:

    a. as soon as possible, but no later than **February 24, 2023**, reinstate the men's rowing team to its varsity intercollegiate status;

    b. **on or before March 12, 2023**, provide the men's rowing team with full funding, staffing, and other benefits commensurate with its status as a varsity-level intercollegiate team.[7]

    c. If there are compelling reasons that FIT is unable to comply with the March 12, 2023 deadline despite due diligence, it must notify the Court in writing **on or before 5:00 PM on March 3, 2023**.

3. FIT is **PRELIMINARY ENJOINED**

    a. from taking any action in furtherance of eliminating the men's rowing team or any men's intercollegiate athletic team at the institution pending a full trial on the merits or until the Court orders otherwise;

    b. from retaliating against Plaintiffs in any manner for asserting their legal rights in this case.

4. No bond is required.

---

[7] FIT may request the Court for additional time to comply with this Order if it can show due diligence and a compelling reason for an extension.

**DONE** and **ORDERED** in Orlando, Florida on February 17, 2023.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record